UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
TRUSTEES OF THE PAVERS AND ROAD :
BUILDERS DISTRICT COUNCIL WELFARE, :
PENSION, ANNUITY, AND :
APPRENTICESHIP, SKILL IMPROVEMENT : **REPORT AND**
AND SAFETY FUNDS, : **RECOMMENDATION**
 :
                Plaintiffs, : 19-CV-2312 (ARR)(PK)
 :
       -against- :
 :
SHELBOURNE CONSTRUCTION CORP., :
 :
               Defendant. :
 :
 :
------------------------------------------------------------------ x

**Peggy Kuo, United States Magistrate Judge:**

      The Trustees of the Pavers and Road Builders District Council Welfare, Pension, Annuity, and Apprenticeship, Skill Improvement and Safety Funds ("Plaintiffs") brought this action against Shelbourne Construction Corp. ("Defendant"), pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* and Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, *et seq.*, seeking to recover contributions to employee benefits funds that Defendant has failed to pay them. (*See* Compl., Dkt. 1.) Plaintiffs are trustees of multiemployer labor-management trust funds administered on behalf of labor unions whose members benefit from the funds. (*Id.* ¶¶ 4, 6, 13.) Plaintiffs are organized and operated in accordance with Section 302(c) of the LMRA, 28 U.S.C. § 186(c), and the funds are employee benefit plans within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3). (*Id.* ¶ 4.)

      Before this Court on referral from the Honorable Allyne R. Ross is Plaintiffs' Motion for Default Judgment (the "Motion"). (*See* Motion, Dkt. 12; August 27, 2019 Order.) For the reasons stated herein, the undersigned respectfully recommends that the Motion be granted.

1

## FACTUAL BACKGROUND

### A.    Collective Bargaining Agreement between Defendant and the Union

Defendant entered into a Collective Bargaining Agreement (the "CBA") with the Highway, Road and Street Construction Laborers Local Union 1010 (the "Union"), effective from July 1, 2018 to June 30, 2021.[1]  (Ex. A to the Declaration of Keith Loscalzo in Support of Default Judgment ("Loscalzo Decl."), Dkt. 14-1; *see also* Compl. ¶ 6.)

Pursuant to the CBA, Defendant must pay certain monthly contributions to Plaintiffs' Employee Benefits funds in connection with all work performed in the geographic jurisdiction of the Union.  (Compl. ¶ 8; CBA, Art. IX.)  Contributions consist of payments to the employee benefits funds directly, and also to the union in the form of "union assessments."  (CBA Art. IX sec. 1(b).)  Defendant submits the contributions in one check, and the Fringe Benefits Funds forward the "union assessments" to the Union.[2]  (*Id.*)

All contributions are due no later than 35 days after the work was performed. (CBA Art. IX sec. 1(b).)  Along with contributions, Defendant is required to provide written reports detailing the number of hours worked by Union members.  (*Id.* Art. IX sec. 1(c).)  Failure to pay contributions subjects Defendant to ten percent annual interest on the contributions owed, costs and attorneys' fees, and liquidated damages of ten percent of the amounts owed.  (*Id.* Art IX sec. 5.)

### B.  Trust Agreements and Collection Policy for Delinquent Employers

The CBA incorporates the terms and conditions of the Amended and Restated Agreements and Declarations of Trust of the Pavers and Road Builders District Council Apprenticeship Skill

---

[1] At the hearing and inquest on February 11, 2020, Plaintiff confirmed that the Union and Defendant previously entered into a substantially similar CBA, effective from July 1, 2015 to June 30, 2018.  (*See* Dkt. 20.)

[2] At the hearing and inquest, Plaintiffs' counsel explained that the "union assessments" consist of contributions to the Local 1010 Training Fund, the Local 1010 LECET, the Heavy Construction Industry Fund, the NYS LECET, and the NYS Laborers Health & Safety Fund.  (*See* CBA Art. IX sec. 1(b).)

Improvement and Safety Fund, the Pension Fund, the Welfare Fund, and the Annuity Fund (together, the "Trust Agreements"). (Declaration of Joseph Montelle in Support of Default Judgment ("Montelle Decl.") ¶ 5, Dkt. 15; Ex. A to the Montelle Decl., Dkt. 15-1.) The Trust Agreements and the plan implementing them (the "Plan") establish the rules for managing the employee benefits funds (the "Fringe Benefits Funds.") (The Plan, Dkt. 15-1 at PageID #94-133.) Defendant is bound by the terms and conditions of the Trust Agreements. (CBA Art. IX sec. 1(b).) The Plan provides that the Board of Trustees (the "Board"), comprised of representatives of the employers or the participants in the employee benefits funds, has the "exclusive right to interpret the Plan and to decide any matters arising thereunder in connection with the administration of the Plan." (Montelle Decl. ¶ 5; the Plan Art. IX, at Page ID #120.) The Trust Agreements also provide that the Board has the "power to interpret, apply, construe, and amend" the Plan and the Trust Agreements. (*See* Trust Agreements Arts. VI, IX, at PageID #120, 152, 174, 195.) Pursuant to the Trust Agreements, the specific amount of employer contributions to the Plan may be set forth in the CBA. (Trust Agreements, Article VII).

In order to administer the Plan, the Board has implemented a Policy for Collection of Delinquent Fringe Benefit Contributions (the "Collection Policy"), which delineates how Plaintiffs may seek contributions to the Plan from employers when they have not been paid properly. (Ex. B. to the Montelle Decl., Dkt. 15-2.) The Collection Policy provides a Collection Procedure that includes the following rights and remedies for Plaintiffs against employers who are delinquent in submitting the required contributions and reports:

Article I of the Collection Policy gives the Board the authority to:

- exercise all remedies available to it under the CBA, the Trust Agreements, and applicable law, including ERISA;

- establish the date on which contributions are due;

3

- require delinquent employers to pay interest on contributions not made on or before their due date, as well as pay attorneys' fees and other expenses incurred by the Fringe Benefits Funds in determining the amount of delinquency; and

- to recover liquidated damages.

(Collection Policy Art. I ¶¶ 1-7.)

Article II sets forth the procedures for collecting funds from employers. These state that:

- Required payments to the Fringe Benefits Funds, along with the associated remittance report (the "Contributions"), are due on the 35th day after the close of the month in which the hours were worked by Union members who work for the employer (the "Due Date");

- Contributions become delinquent on the 36th day;

- If the Contributions are not received by the 36th day, the Fringe Benefits Funds shall send a demand letter to the employer;

- If the employer does not submit the Contributions within 30 days of the date of the demand letter, then the matter of collection is referred to Counsel[3];

- The employer is liable for the delinquent Contributions, plus ten percent annual interest thereon (calculated from the Due Date); plus liquidated damages in the amount of ten percent of the amount of Contributions owed; plus costs and attorneys' fees.

(Collection Policy Art. II ¶¶ 1-5.)

Article III of the Collection Policy, entitled, "Legal Action and Settlement," establishes the following process for bringing legal action against an employer:

- Legal Counsel for the Board "shall send a letter to the employer demanding immediate payment of the delinquent Contributions upon pain of legal proceedings." Counsel shall also send a copy of the letter to the Fund Office Union.

- 20 days after the date of counsel's letter, counsel shall inquire whether the delinquent employer has paid its Contributions. If it has not paid, then counsel shall commence a lawsuit in federal court under ERISA, unless the Trustees or the Collections Subcommittee determine that the amount of delinquency would not exceed the cost of recovery, or if the Contributions and interest do not exceed $10,000.

(*Id.* Art. III sec. A. ¶¶ 1-6.)

Article IV of The Collection Policy, entitled "Payroll Audits," establishes the method of

---

[3] The Collection Policy refers to "Council," but this appears to be an error, given the context.

4

calculating the estimated delinquent Contributions when an employer has not submitted Contributions for at least two months. The Contributions shall be calculated by projecting the greater of:

- The average of the last three months during which the employer actually submitted both payments and remittance reports; or

- The average of the last 12 months during which the employer actually submitted both payments and remittance reports.

- The Board's projection is the only proof that is required in order to obtain a judgment.

(*Id.* Art. IV ¶¶ 1-9.)

### C. Defendant's Failure to Timely Pay Contributions

Defendant failed to submit monthly remittance reports and contributions for ten months, from December 2017 through August 2018, as well as the month of February 2019.[4] (Compl. ¶ 18; Montelle Decl. ¶ 9.) Defendant also failed to timely remit contributions for four months, from September through December 2018. (Compl. ¶ 25; Montelle Decl. ¶ 17.)

Plaintiffs submitted documentation demonstrating that they followed the procedural requirements of having their attorney send Defendant a delinquency letter and then pursue litigation after 20 days if the delinquency continued, pursuant to Collection Policy, Article III. Plaintiffs submitted five letters, dated March 19, 2018, April 26, 2018, May 29, 2018, September 21, 2018, and October 18, 2018, warning Defendant of its delinquency and that legal proceedings may be instituted against it without further warning.[5] (Delinquency Letters, Dkt. 19.)

---

[4] The Complaint also alleges that Defendant failed to submit a report and contribution for the month of September 2017 (Compl. ¶ 18), but Plaintiffs determined that Defendant had submitted contributions for that month. Plaintiffs therefore no longer seek delinquent contributions for September 2017. (Montelle Decl. ¶ 11 n.1.)

[5] Plaintiffs did not send Defendant a Delinquency Letter concerning its failure to pay contributions for February 2019. However, pursuant to Article II of the Collection Policy, the February 2019 contributions were delinquent as of April 5, 2019, and the Complaint was filed on April 19, 2019. Article I of the Collection Policy allows the Board the ability to waive procedural requirements in a particular instance.

## DISCUSSION

I.  **Default Judgment Standard**

Federal Rule of Civil Procedure 55 governs the procedure that applies in cases where there is a default during the course of litigation. *See* Fed. R. Civ. P. 55; *see also City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011). It provides "a 'two-step process' for the entry of judgment against a party who fails to defend." *Id*; *see also GuideOne Specialty Mut. Ins. Co. v. Rock Cmty. Church, Inc.*, 696 F. Supp. 2d 203, 208 (E.D.N.Y. 2010). First, when a defendant "has failed to plead or otherwise defend," the Clerk of Court enters the defendant's default. Fed. R. Civ. P. 55(a). Then, the plaintiff must "apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(2).

A default "constitutes an admission of all well-pleaded factual allegations in the complaint and the allegations as they pertain to liability are deemed true." *United States v. Myers,* 236 F. Supp. 3d 702, 706 (E.D.N.Y. 2017) (citations omitted). However, "just because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right." *GuideOne Specialty Mut. Ins. Co.*, 696 F. Supp. 2d at 208. The Court must ensure that (1) jurisdictional requirements are satisfied, *see Mickalis*, 645 F.3d at 125-27; (2) the plaintiff took all the required procedural steps in moving for default judgment, Local Civ. R. 55.2(c); and (3) the plaintiff's allegations, when accepted as true, establish liability as a matter of law. *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009). The Court exercises significant discretion in deciding whether to grant a default judgment, including whether the grounds for default are clearly established and the amount of damages. *See GuideOne Specialty Mut. Ins. Co.*, 696 F. Supp. 2d at 208; *see also Shah v. N.Y. State Dep't of Civil Serv.*, 168 F.3d 610, 615 (2d Cir. 1999); *Klideris v. Trattoria El Greco*, No. 10-CV-4288 (JBW) (CLP), 2011 WL 7114003, at *4

---

(Collection Policy Art. I ¶ 7.) During the inquest and hearing on February 11, 2020, Plaintiffs' counsel explained that they were invoking their ability to collect for the month of February 2019. Given Defendant's failure to respond to the five Delinquency Letters, and the warnings therein that legal proceedings may be commenced without further warning, and the flexibility provided Plaintiffs pursuant to the Collection Policy, the undersigned finds that the February 2019 contributions are properly sought in the Complaint.

(E.D.N.Y. Sept. 23, 2011), *R&R adopted,* 2012 WL 273078 (E.D.N.Y. Jan. 30, 2012); *Mickalis,* 645 F.3d at 129.

## II. Jurisdictional and Procedural Requirements

### a. Jurisdiction

The court from which default judgment is sought must assure itself that it has subject matter jurisdiction over the action. *See Mickalis,* 645 F.3d at 125-26; *see also Jennifer Matthew Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Human Servs.,* 607 F.3d 951, 955 (2d Cir. 2010). The Court may also inquire as to whether it has personal jurisdiction. *See Mickalis,* 645 F.3d at 133; *see Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.,* 619 F.3d 207, 213 (2d Cir. 2010).

Subject matter jurisdiction is found pursuant to Section 301(a) of the LMRA, which states, "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." *See Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 403 (1988).

This Court has personal jurisdiction over Defendant because Defendant is a New York corporation with its principal place of business within the Eastern District of New York. (Compl. ¶ 5.) *See Daimler AG v. Bauman,* 571 U.S. 117, 137 (2014) ("With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'") (alteration in original).

### b. Service

The Summons and Complaint must be properly served on the defaulting party. *See Advanced Capital Commercial Group, Inc. v. Suarez,* No. 09-cv-5558 (DRH) (GRB), 2013 WL 5329254, at *2 (E.D.N.Y. Sept. 20, 2013). Plaintiffs have made a *prima facie* showing of proper service of the

Summons and Complaint on Defendant by filing a process server's Affidavit of Service Through the Secretary of State pursuant to § 306 of the New York Business Corporation Law. (Dkt. 7.) *See Old Republic Ins. Co. v. Pac. Fin. Servs. of America, Inc.*, 301 F.3d 54, 57 (2d Cir. 2002).

### c. Procedural Requirements

Plaintiffs have demonstrated that they have met the procedural requirements for filing a motion for default judgment pursuant to Fed. R. Civ. P. 55 and Local Rule 55.2, including taking the required procedural steps to provide proper notice to Defendant. They requested a Certificate of Default (which was entered by the Clerk of the Court), and they notified Defendant of the status of this action by mailing Defendant the Motion papers. (Dkts. 8, 10, 17.)

## III. Liability

When determining liability, the Court accepts as true all well-pleaded allegations in the Complaint, drawing all reasonable inferences in favor of Plaintiffs. *See Au Bon Pain Corp v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981); *see also Finkel*, 577 F.3d at 84; *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). Plaintiffs seek a default judgment against Defendant for unpaid benefit contributions pursuant to ERISA, 29 U.S.C. § 1145, and violations of the CBA as set forth in the LMRA, 29 U.S.C. § 185.

Section 515 of ERISA provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. A "multiemployer plan" is a plan "to which more than one employer is required to contribute," and "which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer." 29 U.S.C. § 1002(37). An "employee benefit plan" as defined by ERISA is an "employee welfare benefit plan or an

employee pension benefit plan," or a plan that is both an employee welfare benefit plan and an employee pension benefit plan. *Id.* § 1002(3). The LMRA authorizes "suits for violation of contracts between an employer and a labor organization representing employees." 29 U.S.C. § 185(a). A "labor organization" is any organization "in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5).

Pursuant to Section 502(g)(2) of ERISA, where a "judgment in favor of the plan is awarded" under ERISA Section 515, the Court shall award the plan unpaid contributions, the greater of interest on the unpaid contributions or liquidated damages provided under the plan not exceeding 20% of the unpaid contributions, reasonable attorneys' fees and costs, and other equitable relief the Court deems appropriate. 29 U.S.C. 1132(g)(2); *see Iron Workers Dist. Council of W. N.Y. & Vicinity Welfare & Pension Funds v. Hudson Steel Fabricators & Erectors, Inc.*, 68 F.3d 1502, 1507 (2d Cir. 1995); *Mason Tenders Dist. Council Welfare Fund v. LJC Dismantling Corp.*, 400 F. Supp. 3d 7, 23 (S.D.N.Y. 2019); *Finkel v. Universal Elec. Corp.*, 970 F. Supp. 2d 108, 121 (E.D.N.Y. 2013).

Here, Plaintiffs are employer and employee trustees of a "multiemployer plan," as defined by ERISA. (Compl. ¶ 4.) The Fringe Benefits Funds are organized and operated pursuant to Section 302(c) of the LMRA, 29 U.S.C. § 186(c), and are "employee benefit plans" as defined by Section 3(3) of ERISA, 29 U.S.C. § 1002(3). (*Id.* ¶ 4.) The Union is a "labor organization" within the meaning of the LMRA. (*Id.* ¶ 7.) In addition, Defendant is bound by the CBA, the Trust Agreements, and the Collection Policy. (*Id.* ¶¶ 6, 12, 14; Ex. A to the Loscalzo Decl.; Exs. A and B to the Montelle Decl.) Defendant violated the CBA when it failed to remit monthly reports and contributions to the Fringe Benefits Funds for the months of December 2017 through August 2018, and February 2019. (Compl. ¶¶ 17-20; Montelle Decl. ¶¶ 9-11; CBA Art. IX.) Defendant also violated the CBA when it failed to timely remit monthly reports and contributions for work

9

performed from September 2018 through December 2018.  (Compl. ¶¶ 23-26; Montelle Decl. ¶ 17; CBA Art. IX.)  Plaintiffs followed the procedural steps required by the CBA and the Collection Policy to inform Defendant of its delinquency prior to filing the Complaint.  (*See* Delinquency Letters; Collection Policy Arts. II-III.)

Accepting Plaintiffs' allegations as true, as required when considering a motion for default judgment, the undersigned finds that Plaintiffs have adequately established claims for unpaid contributions pursuant to ERISA, 29 U.S.C. § 1145, and violation of the CBA pursuant to the LMRA, 29 U.S.C. § 185.

## IV. Damages

Pursuant to ERISA Section 502(g), Plaintiffs seek judgment for the amount of unpaid contributions and union assessments, plus ten percent interest on the unpaid contributions and the late payments, and liquidated damages consisting of ten percent of the unpaid contributions, as well as reasonable attorneys' fees and costs incurred in enforcing the CBA, the Trust Agreements, and the Collection Policy.  (Compl. *Ad damnum* clause; Pls. Mem. at 5, Dkt. 16.)  Plaintiffs also seek pre-judgment interest.  (Proposed Order, Dkt. 13-5.)

Although "a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." *Greyhound Exhibitgroup*, 973 F.2d at 158.  On a Motion for Default Judgment, Plaintiffs bear the burden of presenting proof of damages. *See CIT Bank, N.A. v. Dambra*, No. 14-CV-3951 (SLT) (VMS), 2015 WL 7422348, at *5 (E.D.N.Y. Sept. 25, 2015), *R&R adopted*, 2015 WL 7430006 (E.D.N.Y. Nov. 20, 2015).  To reach a conclusion as to damages, the Court relies on documentary evidence and detailed affidavits. *See Action S.A. v. Marc Rich & Co. Inc.*, 951 F.2d 504, 508 (2d Cir. 1991).  The amount of damages awarded, if any, must be ascertained "with reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999).

10

a. **Unpaid Contributions and Union Assessments**

Pursuant to the Collection Policy, Plaintiffs are entitled to estimate Defendant's unpaid contributions as the greater of the average of the last three months for which Defendant submitted payments and remittance reports, or the last 12 months. (Collection Policy Art. IV ¶ 9.) The average of the last three payments and reports submitted by Defendant was calculated to be $6,845.27. (Ex. D to the Montelle Decl.) Plaintiffs have also calculated the average of the last 12 months in which Defendant submitted payments and reports to be $13,191.34.[6] (*Id.*) Plaintiffs are therefore entitled to $13,191.34 of monthly contributions, multiplied by the ten months of unpaid contributions that Defendant owes, for a total of $131,913.40. (*Id.*)

Accordingly, the undersigned recommends that Plaintiffs be awarded **unpaid contributions and union assessments, totaling $131,913.40**.

b. **Interest**

Pursuant to the CBA and the Collection Policy, Plaintiffs seek ten percent annual interest on the unpaid contributions, excluding the unpaid union assessments, in the amount of **$20,037.78**. (*See* Shelbourne Damages Calculations, Dkt. 21; CBA Art. IX sec. 5; Collection Policy Art. II ¶ 5.)

In order to determine the amounts owed as union assessments, Plaintiffs divided the average monthly contribution amount, $13,191.34, by the monthly contribution per hour worked, $43.66, to equal a total average of 302.1377691 hours worked per month. (Ex. D to the Montelle Decl.) The average monthly contributions owed to the Fringe Benefits Funds (*i.e.*, the Pavers Welfare Fund, the Pavers Vacation Fund, the Pavers Pension Fund, and the Pavers Annuity Fund) equal $12,466.20. (*Id.*) The average monthly union assessments (*i.e.*, contributions to the Local 1010 Training Fund,

---

[6] Plaintiffs have calculated Defendant's average unpaid contributions using reports submitted by Defendant for the following months: April through August 2017; October 2017; November 2017; September through December 2018; and January 2019. (Montelle Decl. ¶¶ 11-12; Ex. C to the Montelle Decl., Remittance Reports, Dkt. 15-3; Ex. D to the Montelle Decl., Calculation of Estimated Contributions, 15-4.)

11

Local 1010 LECET, Heavy Construction Industry Fund, NYS LECET, and NYS Laborers Health & Safety Fund) equal $725.13. (*Id.*)

Plaintiffs calculated the interest owed for each of the 10 delinquent contributions (excluding the union assessments) of $12,466.20 by determining the Due Date (the 35th day after the close of the month in which the work was completed). Ten percent annual interest of $12,466.20 is a daily interest rate of $3.42. The daily interest rate was then multiplied by the number of days each monthly contribution check was late (calculated from the Due Date). The interest owed on each of the ten delinquent contributions was then added together, totaling $20,037.78 in interest owed as of February 11, 2020. (*See* Shelbourne Damages Calculations, Dkt. 21; CBA Art. IX sec. 5; Collection Policy Art. II ¶ 5.) The following table sets forth the interest owed on each delinquent contribution:

| Month of Work | Due Date | Interest Through | Contributions (excluding union assessments) | Days Late (as of 2/11/2020) | Daily Interest | Total Interest |
|---|---|---|---|---|---|---|
| December 31, 2017 | February 4, 2018 | 2/11/2020 | $12,466.20 | 737 | $3.42 | $2,520.54 |
| January 31, 2018 | March 7, 2018 | 2/11/2020 | $12,466.20 | 706 | $3.42 | $2,414.52 |
| February 28, 2018 | April 4, 2018 | 2/11/2020 | $12,466.20 | 678 | $3.42 | $2,318.76 |
| March 31, 2018 | May 5, 2018 | 2/11/2020 | $12,466.20 | 647 | $3.42 | $2,212.74 |
| April 30, 2018 | June 4, 2018 | 2/11/2020 | $12,466.20 | 617 | $3.42 | $2,110.14 |
| May 31, 2018 | July 5, 2018 | 2/11/2020 | $12,466.20 | 586 | $3.42 | $2,004.12 |
| June 30, 2018 | August 4, 2018 | 2/11/2020 | $12,466.20 | 556 | $3.42 | $1,901.52 |
| July 31, 2018 | September 4, 2018 | 2/11/2020 | $12,466.20 | 525 | $3.42 | $1,795.50 |
| August 31, 2018 | October 5, 2018 | 2/11/2020 | $12,466.20 | 494 | $3.42 | $1,689.48 |
| February 28, 2019 | April 4, 2019 | 2/11/2020 | $12,466.20 | 313 | $3.42 | $1,070.46 |
| Total | | | $131,913.30 | | | $20,037.78 |

Pursuant to Section 502(g)(2) of ERISA, interest on unpaid contributions "shall be determined by using the rate provided under the plan," which is ten percent per year. 29 U.S.C. § 1132(g). (*See* CBA Art. IX sec. 5; Collection Policy Art. II ¶ 5.)

In order to ease the burden of calculating interest individually for each of the delinquent checks going forward, the undersigned respectfully recommends that Plaintiffs be awarded **$20,037.78 in interest**, and that interest continue to accrue on the unpaid contributions excluding union assessments, at an annual rate of ten percent, or **$5.49 per day, from February 12, 2020 through the date of judgment**.

### c. Late-Payment Interest

In addition, Plaintiffs seek ten percent interest on the four late payments that Defendant submitted on February 11, 2019 for the months of September 2018 through December 2018, in the amount of **$437.79**. (Compl. ¶ 19; Pls. Mem. at 2; Montelle Decl. ¶ 17; Ex. F to the Montelle Decl., Late Payment Interest Report, 15-6.) Plaintiffs have correctly calculated the amount of interest accrued in the five-month period between the Due Date of each delinquent contribution, and when they were submitted to Plaintiffs on February 11, 2019.

Accordingly, the undersigned recommends that Plaintiffs be awarded **$437.79 in late-payment interest**.

### d. Liquidated Damages

Pursuant to the CBA and the Collection Policy, Plaintiffs are entitled to liquidated damages of ten percent of the unpaid contributions, excluding unpaid union assessments, equaling $12,466.20. (CBA Art. IX sec. 5(c); Collection Policy Art. II ¶ 5.) The undersigned recommends that Plaintiffs be awarded **$12,466.20 in liquidated damages**.

### e. Post-Judgment Interest

"Interest shall be allowed on any money judgment in a civil case recovered in a district

court." 28 U.S.C. § 1961. Post-judgment interest is governed by the federal rate as set forth in 28 U.S.C. § 1961. *See Tacuri v. Nithun Constr. Co.*, No. 14-CV-2908 (CBA) (RER), 2015 WL 790060, at *12 (E.D.N.Y. Feb. 24, 2015). The undersigned respectfully recommends that Plaintiffs be awarded **post-judgment interest, to be calculated from the date the Clerk of Court enters judgment in this action until the date of payment, at the rate set forth in 28 U.S.C. § 1961**.

f. **Attorneys' Fees and Costs**

Plaintiffs seek to recover attorneys' fees and costs to date. (Compl. *Ad damnum* clause.) Attorneys' fees and costs are mandatory under ERISA. *See* 29 U.S.C. § 1132(g)(2)(D); *see also LJC Dismantling Corp.*, 400 F. Supp. 3d at 25. The CBA and the Collection Policy also provide for Plaintiffs' recovery of attorneys' fees and costs. (CBA Art IX. sec. 5; Collection Policy Art. II ¶ 5.) In order to be awarded attorneys' fees, Plaintiffs are required to provide contemporaneous time sheets. *See Lewis v. Coughlin*, 801 F.2d 570, 577 (2d Cir. 1986). Plaintiffs have done so. (*See* Updated Attorneys' Fees and Costs, Dkt. 21-1.)

The attorneys' fees and costs awarded to Plaintiffs by the Court must be "reasonable." *See Riley v. City of New York*, No. 10-CV-2513 (MKB), 2015 WL 9592518, at *1 (E.D.N.Y. Dec. 31, 2015). "[T]he lodestar – the product of a reasonable hourly rate and the reasonable number of hours required by the case – creates a presumptively reasonable fee." *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011); *see also Scharff v. Cty. of Nassau*, No. 10-CV-4208 (DRH) (GRB), 2016 WL 3166848, at *3 (E.D.N.Y. May 20, 2016), *R&R adopted*, 2016 WL 3172798 (E.D.N.Y. June 6, 2016); *Riley*, 2015 WL 9592518, at *1. To calculate the lodestar, the Court determines a reasonable hourly rate and a reasonable number of hours. "District courts have broad discretion to determine both the reasonable number of compensable hours and the reasonable hourly rate." *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 203 (E.D.N.Y. 2006). The party applying for fees must support the hourly rates it claims with, for example, evidence of counsel's expertise and prevailing

14

market rates. *See Riley*, 2015 WL 9592518, at *2.

Plaintiffs seek $5,885 in attorneys' fees and $552.83 in costs. (*See* Updated Attorneys' Fees and Costs.)

### A. Hourly Rate

To determine a reasonable hourly rate, the Court considers "rates prevailing in the community for similar services of lawyers of reasonably comparable skill, experience, and reputation." *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1159 (2d Cir. 1994) (internal quotations omitted). The "community" is the district in which the reviewing court sits. *Scharff*, 2016 WL 3166848, at *4. "The reasonable hourly rate is the rate a paying client would be willing to pay…bear[ing] in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008). The Court must also "bear in mind *all* of the case-specific variables that [the Second Circuit] and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate." *Id.* at 190 (emphasis in the original). Those factors include the attorney's experience and expertise. *See Brady*, 455 F. Supp. 2d at 204; *Chen v. Cty. of Suffolk*, 927 F. Supp. 2d 58, 71 (E.D.N.Y. 2013). The fee applicant has the burden of justifying the requested rate as reasonable. *See Scharff*, 2016 WL 3166848, at *4.

In recent years, fees in ERISA cases have been awarded in the Eastern District of New York at an hourly rate of $300 to $350 for partners, $200 to $300 for associates, and up to $90 for non-attorney support staff. *See UFCW Local 174 Pension Fund v. 5600 Mkt. Corp.*, No. 17-CV-5789 (CBA) (CLP), 2018 WL 4403394, at *9 (E.D.N.Y. Aug. 16, 2018), *R&R adopted as modified*, 2018 WL 4388452 (E.D.N.Y. Sept. 14, 2018) (citing cases); *Universal Elec. Corp.*, 970 F. Supp. at 128-130.

Plaintiffs were represented in this action by attorneys Adrianna R. Grancio ("Grancio") and Nicole Marimon ("Marimon"). Grancio is an associate and Marimon is a partner in the law firm

Virginia & Ambinder, LLP. (*See* Grancio Decl. ¶¶ 8-9, Dkt. 13.) Grancio is a 2016 graduate of St. John's University Law School, and Marimon is a 2014 graduate of Fordham University School of Law. (*Id.*) Both attorneys billed their time for this matter at a rate of $250 per hour, which falls within the range of rates recognized as reasonable in the Eastern District of New York. (*Id.*) In addition, the legal assistants billed their time at a rate of $80 per hour, which is also recognized as reasonable in the Eastern District of New York. (*Id.* ¶ 7.) The undersigned finds that these are reasonable hourly rates.

### B. Hours Billed

"[T]he district court should exclude excessive, redundant or otherwise unnecessary hours…." *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999). Plaintiffs' counsel spent a total of 45.30 hours on this matter. (Updated Attorneys' Fees and Costs.) The undersigned does not find counsel's billed hours to be excessive, redundant, or unnecessary. The presumptively reasonable fee is therefore **$5,885, and should be awarded**.

### C. Costs

Plaintiffs seek an award of $552.83 in costs. (Updated Attorneys' Fees and Costs.) This amount covers the filing fee ($400.00), service of process ($70.00), and postage and docket review costs ($82.83). The requested costs of **$552.83** are reasonable and should be awarded.

## CONCLUSION

Based on the foregoing, it is respectfully recommended that the Motion be granted, and that Plaintiffs be awarded damages in the amount of:

(1) Unpaid contributions and union assessments, consisting of **$131,913.40**;

(2) Interest on unpaid contributions excluding union assessments in the amount of

   **$20,037.78, plus $5.49 per day from February 11, 2020 through the date of judgment**;

16

(3) Late-payment interest of **$437.79**;

(4) Liquidated damages in the amount of **$12,466.20**;

(5) Attorneys' fees of **$5,885**;

(6) Costs of **$552.83**; and

(7) Post-judgment interest, to be calculated from the date the Clerk of Court enters judgment in this action until the date of payment, at the rate set forth in 28 U.S.C. § 1961.

Plaintiffs are directed to serve this Report and Recommendation on Defendant forthwith and file proof of service in the docket by **March 10, 2020**.

Any objection to this Report must be filed in writing with the Clerk of Court within fourteen (14) days of service. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to timely file any just objection waives the right to further judicial review of this Report and Recommendation. *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

                                                               **SO ORDERED:**

                                                              *Peggy Kuo*
                                                              PEGGY KUO
                                                              United States Magistrate Judge

Dated:    Brooklyn, New York
               March 5, 2020